UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YANG ENTERPRISES, INC.,

        Plaintiff,

v.                                       Case No. 6:16-cv-612-Orl-37DCI

SPACE COAST LAUNCH SERVICES,
LLC,

        Defendant.
_____

## <u>ORDER</u>

This matter is before the Court on the following matters:

(1)     Defendant's Motion for Summary Judgment (Doc. 49);

(2)     Plaintiff, Yang Enterprises, Inc.'s Response to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 56);

(3)     Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 61);

(4)     Plaintiff, Yang Enterprises, Inc.'s Motion for Summary Judgment on Interpretation of Contract(s) and Incorporated Memorandum of Law (Doc. 51);

(5)     Defendant's Response to Plaintiff's Motion for Summary Judgment on Interpretation of Contract(s) and Incorporated Memorandum of Law (Doc. 57);

(6)     Plaintiff, Yang Enterprises, Inc.'s Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment on Interpretation of Contract (Doc. 60);

(7)     Amended Joint Stipulation of Agreed Material Facts (Doc. 59);

(8)     Defendant's Supplemental Briefing on Lost Profits and Response to Question Posed by Court During Oral Argument (Doc. 72); and

(9)     Plaintiff, Yang Enterprises, Inc.'s Reply to Defendant's Supplemental Briefing on Lost Profits and Response to Question Posed by Court During Oral Arguments (Doc. 73).

## I.     INTRODUCTION

In this diversity action brought by subcontractor Yang Enterprises, Inc. ("**Yang**") against prime contractor Space Coast Launch Services, LLC ("**SCLS**"), the parties dispute the meaning and effect of the terms of Subcontract Number 05-C-0008-02 ("**Subcontract**"),[1] and whether SCLS should be held liable for breach of contract ("**Count I**") and the implied duty of good faith and fair dealing ("**Count II**").[2] (*See* Doc. 11; Doc. 59, ¶¶1, 2, 55–57; Doc. 70, pp. 5, 18.) Seeking pre-trial resolution of discrete issues—particularly the meaning of Part I, Paragraph 1(d) ("**Term 1(d)**") and Part II, Paragraph 16(c) ("**Term 16(c)**") of the Subcontract—the parties filed and briefed cross-

---

[1] The Subcontract—a copy of which is provided over several docket entries (*see* Docs. 1-1, 49-17, 49-18, 49-19, 52-1)—is cited herein as (Subcontract, Part __, ¶__) or (Subcontract, Attachment __, p. __).

[2] In an Order dated October 4, 2016, the Court dismissed Yang's third claim for declaratory judgment. (*See* Doc. 34.)

motions for summary judgment.[3] (Docs. 49, 51, 56, 57, 59, 60, 61.) After conducting a hearing on such motions ("**Hearing**"), the Court directed the parties to supplement their briefing. (*See* Doc. 70, pp. 38, 45–46.) With the supplemental briefing complete (*see* Docs. 72, 73), the matter is now ripe for adjudication.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

Under the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To meet this burden, a movant must: (1) cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or" (2) show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence" of a genuine dispute. Fed. R. Civ P. 56(c)(1).

If a movant meets its initial burden, then the Court must enter summary judgment unless the non-movant shows that a "genuine" issue of material fact remains for trial. *See*

---

[3] The parties filed a helpful but limited stipulation of agreed facts (Doc. 59) along with voluminous documents and sworn statements (*see* Docs. 49-1–49-23, 51-1–59-12, 52-1–52-9, 53-1–53-10, 72-1). Part III of this Order summarizes the pertinent undisputed facts. Disputed facts are discussed as necessary in Part IV, *infra.*

*Scott v. Harris*, 550 U.S. 372, 380 (2007). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *See Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). "An issue is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014). Courts must not make credibility assessments or weigh conflicting evidence at the summary judgment stage. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Rather, courts must: (1) view the record evidence in the light most favorable to the non-moving party; and (2) draw all reasonable inferences in favor of the non-moving party. *See White v. Pauly*, 137 S. Ct. 548, 550 (2017). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B.    Applicable Law**

For purposes of summary judgment, the substantive law applicable to the case determines what facts are material. *See Hickson*, 357 F.3d at 1259. Here, the parties agree that the Court should apply Virginia law and federal contract law in accordance with Part II, Paragraph 29 of the Subcontract ("**Term 29**"),[4] which provides:

> This Agreement and performance hereunder shall be
> interpreted in accordance with, and governed by, the

---

[4] Although the parties agree that the Court should apply federal contract law and Virginia law, they were not consistent in applying one or the other in their filings. (*See* Doc. 70, pp. 11–14.) Further, neither party explicitly noted when Virginia law and federal contract law diverged. (*See id.*)

substantive laws of the Commonwealth of Virginia, except for that body of law commonly referred to as Conflict of Laws. Provided, however, that *if this Agreement is issued under a prime contract* and where federal contract law exists on substantive matters requiring construction under this Agreement, such matters shall be construed in accordance with the applicable federal law. . . .

(Doc. 52-1, p. 18 (emphasis added); *see* Doc. 70, p. 14.)

In diversity cases, this Court applies Florida law to resolve choice-of-law issues. *See Interface Kanner, LLC v. JP Morgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013). Florida courts apply the substantive law of a foreign forum when: (1) the parties have agreed to the application of such law in a written agreement; and (2) the law of the designated forum does not contravene Florida's "strong public policy." *Id*. (quoting *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005)). There is no dispute that the Subcontract was issued under a prime contract, and the parties have not argued that federal contract law or Virginia law contravenes strong public policy in Florida. (*See* Doc. 59, ¶¶ 24, 26.) Thus, the Court will enforce Term 29 and apply federal contract law to contract interpretation and construction issues and will apply Virginia to the remaining substantive issues.

## C. Virginia Law

Recovery for breach of contract under Virginia law, requires proof of: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach." *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004). Virginia implies a duty to act in good faith when exercising contractual discretion, and a plaintiff may base its breach of contract claim on

a defendant's breach of the "covenant of good faith and fair dealing." *See Levine v. Selective Ins. Co. of Am.*, 462 S.E.2d 81, 84 (Va. 1995); *see also Va. Vermiculite, Ltd. v. W.R. Grace & Co. – Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (noting that "the duty of good faith does not prevent a party from exercising its explicit contractual rights").

"The obligation to pay damages arising from an unexcused breach of contract is implied" by Virginia law. *Mullen v. Brantley*, 195 S.E.2d 696, 700–01 (Va. 1973); *see Clevert v. Jeff W. Soden, Inc.*, 400 S.E.2d 181, 182 (Va. 1991) (noting that enforcement of a contract "includes a recovery of damages for any breach, whether total or partial"). Generally, "the proper measure of unliquidated damages for breach of contract 'is the sum that would put [the plaintiff] in the same position, as far as money can do it, as if the contract had been performed.'" *Nichols Const. Corp. v. Va. Machine Tool Co., LLC*, 661 S.E.2d 467, 471 (Va. 2008). This sum need not be proved with exact mathematical precision—"a reasonable basis of computation" suffices. *See Mullen*, 195 S.E.2d at 701.[5]

### III.  THE UNDISPUTED FACTS

#### A.  The Parties

Yang is a women-owned business "that provides design engineering, IT, facility operations and maintenance, logistics and project management services" to federal and state governments and commercial entities. (*See* Doc. 59, ¶5.) SCLS is a private contractor

---

[5] *See also Condo. Servs., Inc. v. First Owners' Assoc. of Forty Six Hundred Condo., Inc.*, 709 S.E.2d 163, 173 (Va. 2011) ("Proof of absolute certainty as to the amount of loss or damage is not essential when the existence of loss is established and the facts and circumstances proven are such as to permit [an] intelligent and probable estimate of the amount of damage or loss sustained.").

who performs "operations and maintenance of critical facilities that belong to the United States Department of the Air Force" ("**USAF**"). (*See id*. ¶4; *see also* Doc. 51-1, p. 34.)

### B. The Teaming Agreement

The parties' "relationship began in 2004 when SCLS's predecessor, DynCorp Technical Services, LLC" ("**DynCorp**") and Yang agreed to work together to submit a bid ("**Bid**") in response to a government contract solicitation that concerned a launch operation and support contract ("**LOSC**") for facilities in Cape Canaveral, Florida. (*See* Doc. 59, ¶3; *see also* Doc. 51-5, p. 30.) In a written agreement dated January 23, 2004 ("**Teaming Agreement**"),[6] Yang and DynCorp set forth the terms under which they agreed to collaborate on the Bid. (*See* Doc. 59, ¶¶9, 10, 11.) The Teaming Agreement anticipated that if the Bid was successful, then the parties would enter into a subcontract based on the "scope of work set forth in Exhibit A" ("**Exhibit A**"). (*See* Doc. 59, ¶12; *see also* Teaming Agreement, Articles 1.1, 2.4, 3.1–3.3, 4.2–4.4.)

Exhibit A states that DynCorp "shall be the prime contractor with [Yang] assuming the role of a subcontractor on an exclusive basis," and:

> It is anticipated that [Yang's] associated share of the work scope will be no less than 12% of the total contract value. Identification of the specific scope of work for which [Yang] shall be responsible will be further defined once the review of the draft RFP and the formal RFP have been completed.

(Teaming Agreement, Exhibit A.) Recognizing that revisions may be required, Yang agreed that it would "enter into good faith negotiations" to revise Exhibit A on

---

[6] The 12-page Teaming Agreement includes 18 articles and one exhibit. (*See* Doc. 49-11 (cited as "Teaming Agreement, Article ___ or Exhibit A, p. __").)

DynCorp's request, and DynCorp agreed that it would not make this request absent a "good faith belief that such is necessary." (*See id*. Article 2.4.)

### C.    The Prime Contract[7]

The Bid—which SCLS submitted with Yang's assistance—was successful, and the USAF, 45th Space Wing Division ("**45 SW**") awarded Prime Contract Number FA2521-05-C-0008 to SCLS in April of 2005 ("**Prime Contract**"). (*See* Doc. 59, ¶¶13–14, 16–18, 22.) The first forty-nine pages of the Prime Contract are organized into sections A through I, which include:

> § A—Solicitation, Offer and Award Form;
> § B—Supplies or Services and Prices/Costs;
> § C—Description/Specs/Work Statement;
> § F—Deliveries or Performance;
> § H—Special Contract Requirements; and
> § I—Contract Clauses.

Section J starts on page fifty, and it provides sixteen Attachments, which cover hundreds of pages.

The stated purposes of the Prime Contract are to provide both "launch operations support technical expertise and services to support the [45 SW] in execution of its mission [payload/satellite processing and launch of those payloads into space]" and "operations, maintenance and engineering support to critical launch, spacecraft and ordnance [sic] facilities and support systems owned by the [45 SW]." (*See id*. ¶19; Prime Contract, § C001 & Attachment 1 (providing a "Statement of Objectives" for the Prime Contract ("**SOO**")).)

---

[7] A copy of the Prime Contract covers two entries on the docket. (*See* Docs. 49-13 & 49-14 (cited as "Prime Contract, §__" or "Prime Contract, Attachment __, p. ___").)

The services and materials necessary to accomplish such purposes are set out in a lengthy "Performance Work Statement" ("**Prime PWS**").[8] (*See* Prime Contract, § C002.)

### 1. Total Funded Contract Value

The Prime Contract is an incrementally-funded Cost Plus Award Fee Contract ("**CPAF**");[9] thus, payments under the Prime Contract consist only of allowable costs actually incurred to provide the requested services and materials ("**Costs**"), a "**Base Fee**" of 3% of Costs, and an "**Award Fee**" of up to 5% of Costs. (*See* Doc. 59, ¶ 22; *see also* Prime Contract, §§ B001, B003, H012(a)(1)).) Along with contract line item numbers ("**CLINs**"),[10] the Prime Contract provides dollar figures ("**Estimated Figures**") for the estimated Costs, Base Fees, and maximum Award Fees ("**MAF**"),[11] during the maximum contract term of ten years and five months ("**Term Limit**"). (*See* Prime Contract, §§ B &

---

[8] Under Federal Acquisition Regulation ("**FAR**"), § 2.101, "Performance Work Statement" ("**PWS**") is defined as "a statement of work for performance-based acquisitions that describes the required results in clear, specific and objective terms with measurable outcomes." *See* 48 C.F.R. § 2.101 (cited herein as FAR §___). Here, the Prime PWS categorizes the required services as in broad categories: Program Management—§ 2.0, Systems Management—§ 3.0, Mission Support—§ 4.0, Launch Communications—§ 5.0, Spaceport Services—§ 6.0, and Legacy Systems Deactivation and Closeout—§ 7.0. (*See* Prime Contract, Attachment 2.)

[9] A CPAF "is a cost-reimbursement contract that provides for a fee consisting of (a) a base amount (which may be zero) fixed at inception of the contract and (b) an award amount, based upon a subjective evaluation by the Government, sufficient to provide motivation for excellence in contract performance." FAR § 16.305.

[10] A contract "'[l]ine item' means the basic structural element in a procurement instrument that describes and organizes the required product or service for pricing, delivery, inspection, acceptance, invoicing, and payment," and a "[l]ine item number means either a numeric or alphanumeric format to identify a line item." FAR §2.101.

[11] Once the F/TD Official provides an Award Fee decision to SCLS through a unilateral contract modification, SCLS could obtain payment of such Award Fee under the applicable CLIN. (*See* Prime Contract, § H012(a)(2)(ii); *see also id*. § B003; *see also* Doc. 51-1, pp. 54–57.)

F.) The Term Limit consists of a **"Transition/Phase-In"** Period (May 2 to June 30, 2005) and a **"Basic" Period** (July 1 to September 30, 2005), followed by ten optional periods of performance (**"Contract Periods"**) covering fiscal years (**"FY"**) 2006 through 2015.[12] (*See* Prime Contract, § B; Doc. 51-4, p. 37.) Added together, the Estimated Figures for all Contract Periods totaled **$297,683,218** (**"Total Funded Contract Value"**).[13]

Ultimately, the Term Limit was reached because, at the end of each Contract Period, 45 SW extended the Prime Contract in accordance with the **"Option Clause."**[14] (*See* Prime Contract, § I (incorporating the full text of FAR § 52.217-9); *see also* Doc. 52-1, pp. 43–44 (providing table listing all final Award Fees); Docs. 53-1 to 53-9 (providing copies of Subcontract modifications).) Further, the actual payments made to SCLS by 45 SW for the initial Term Limit (**"Actual Contract Value"**) exceeded the Total Funded Contract Value. (*See* Doc. 51-2, pp. 28, 71–72; Doc. 51-4, pp. 39–40, 43–44, 53–54.)

### 2. Minimum Subcontracting Requirement

45 SW did not intend that SCLS would directly provide all of the goods and services called for under the Prime Contract. To the contrary, 45 SW intended that SCLS

---

[12] For purposes of the Prime Contract and the Subcontract, a FY starts on October 1 and ends on September 30; so, the last Contract Period ended on September 30, 2015 — which was ten years and five months after the first day of the Transition/Phase-In Period.

[13] Initially, "funds" were "allotted" and "available for payment" of Costs only for the Basic Period. (*See* Prime Contract, § B.) Funds also were "committed for payment" of any earned Award Fee for the Basic Period. (*See id*.) The potential to earn Award Fees was certain only through the FY 09 Contract Period. (*See* Prime Contract, § H012(b).) Thereafter, Award Fees would not be available unilateral modification of the Prime Contract after a favorable determination by the F/TD Official. (*See id*. § H012(b)(1).)

[14] "Option means a unilateral right in a contract by which, for a specified time, the Government may elect to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract." FAR § 2.101.

would provide "small business" ("**SB**") concerns with the "maximum practicable opportunity to participate in performance of launch operations and support."[15] (*See* Prime Contract, § H008(a).) Thus, SCLS agreed to, "consistent with efficient contract performance," subcontract "a minimum of 18% of the *total funded contract value* for the basic effort and each subsequent option period, including any quantity increases, to [SBs]" ("**Minimum Subcontracting Requirement**"). (*See id.* § H008(b) (emphasis added).)

In its required subcontracting plan, SCLS represented that the Prime Contract had a "total estimated contract value" of **$334,699,214**,[16] and SCLS planned to subcontract 20.4% of this amount—an "estimated" **$68,409,598**.[17] (*See id.* at Attachment 5, p. 2.) SCLS represented that the "majority" of its "planned subcontracting" would be with "ExecuSys, Inc." and Yang. (*See id.*; *see also* Doc. 72-1, ¶¶3 & 4.) Further, SCLS represented that it planned to:

> (1) purchase specific "categories of materials and services"—including "Travel," "Office supplies," and "Individual safety equipment"—from SBs (Prime Contract, Attachment 5, pp. 4–5);
>
> (2) identify additional "materials and services categories to be obtained from [SB] concerns" (*id.* at 5);

---

[15] FAR provides definitions and criteria that must be met to qualify as a SB, a disadvantaged SB, and a "women-owned" SB. *See* FAR § 2.101; *see also* FAR § 52.219-8(a).

[16] This figure does not correspond to the Total Funded Contract Value (**$297,683,218**) or the Total Universe Value (**$334,838,943**). (*See supra* Part III.C.1 & n.14.)

[17] A prime contractor is "ineligible for award of a contract" unless it submits an approved subcontracting plan. *See* FAR § 52.219-9(c)(1). Further, failure "to comply in good faith" with an approved subcontracting plan is "a material breach of the [Prime] Contract" (*see id.* § 52-219-9(k)), and a contractor who willfully or intentionally fails to comply with its subcontracting plan may be held liable for liquidated damages (*see id.* § 52.219-16(b)). *See also United States ex rel. Savage v. Wash. Closure Hanford LLC*, No. 2:10-cv-5051-SMJ, 2017 WL 3667709, at *2 (W.D. Wash. Aug. 24, 2017).

(3)     work "with buyers to identify additional *subcontracting opportunities* that can be handled by [SB]" (*id.* at 10 (emphasis added)); and

(4)     discuss "*subcontracting opportunities*" with [SB] representatives (*id.* (emphasis added)).

In measuring compliance with the Minimum Subcontracting Requirement, SCLS counted every subcontract it awarded and every purchase order it issued to an SB under the Prime Contract.[18] (*See* Doc. 51-5, pp. 38–42.) SCLS contends that it met the Minimum Subcontracting Requirement in every Contract Period except for the Transition/Phase In and Basic Periods. (*See* Doc. 72-1, ¶13; *see also* Doc. 51-5, pp. 35–37.)

## D.     The Subcontract

After 45 SW awarded the Prime Contract to SCLS, SCLS and Yang negotiated and entered into the Subcontract. (*See* Doc. 59, ¶¶22, 23, 24, 27; Doc. 72-1, ¶5; *see also* Doc. 70, p. 35 (stating that the Subcontract is a private agreement that was "freely negotiated between two commercial entities").) The Subcontract is an integrated agreement,[19] consisting of a signature page and the following six parts:

I.      Schedule;
II.     General Provisions;
III.    Government Provisions;
IV.     Supplemental Provisions;
V.      Statement of Work/Specification; and

---

[18] A "[p]urchase order, when issued by the Government, means an offer by the Government to buy supplies or services . . . upon specified terms and conditions, using simplified acquisition procedures." FAR § 2.101.

[19] The Subcontract states that it "is the complete and exclusive statement of the terms of the agreement between [SCLS] and [Yang] and supersedes in its entirety any previous understandings, writings, proposals, or other documents between the parties whether oral or written." (Subcontract, Part II, ¶36.)

VI.    Twelve Attachments.[20]

(*See* Subcontract, Signature Page & Part I, ¶¶5(a), 18.) When resolving any inconsistency, these parts are to be given precedence as ordered in the Subcontract. (*See* Subcontract, Part I, ¶ 28.)

The Subcontract issued under the Prime Contract. (*See* Doc. 51-4, p. 11.) Both agreements are CPAFs that share the same Base and Award Fee percentages (*compare* Subcontract, Part I, ¶1(a) & Part II, ¶7(a); *with supra* Part III.C), and both are funded by the USAF 45 SW (Doc. 59, ¶47).[21] (*See* Doc. 49-15, ¶11; 51-1, p. 57.) Although both agreements also had the same Term Limit (*compare* Subcontract, Part I, ¶¶2, 9 & Attachment 1; *with supra* Part III.C), extensions of the Subcontract were conditioned on different and additional requirements (*see* Subcontract, Part I, ¶2(a) (listing five requirements for extension of the Subcontract)).[22] Nonetheless, the parties agree that the Subcontract—like the Prime Contract—lasted the full Term Limit. (*See* Doc. 49-12;

---

[20] The Attachments include: (1) the "Estimated Cost and Fee Summary" ("**ECF Summary**) (*see* Subcontract, Attachment 1); (2) the "Award Fee Summary" ("**AF Summary**") (*see id.* Attachment 2); and (3) the "Award Fee/Term Plan" ("**Subcontract AF/TP**") (*see id.* Attachment 6).

[21] In accordance with the Prime Contract's "Award Fee/Term Plan" ("**AF/T Plan**"), a "Fee/Term Determining Official" ("**F/TD Official**") made final decisions concerning Award Fee scores and Award Fee amounts—if any. (*See* Prime Contract, §§ B003, H012(c), & Attachment 4 (providing a copy of the AF/T Plan).) The Award Fee score determined under the Prime Contract applied to Award Fee determinations for the Subcontract.

[22] The Subcontract used subcontract line item numbers ("**SLINs**") instead of CLINs. (*Compare* Subcontract, Attachment 1; *with supra* Part III.C.1.) The Subcontract provided two SLINs for every FY—one for "Basic Operations, Maintenance and Sustainment" ("**BOMS**") and one for "Contractor Furnished Materials" ("**CFM**"). For FYs 2005 through 2008, the Subcontract provided additional SLINs for the "**Titan Deactivation Option**" (*see* Subcontract, Attachment 1).

Doc. 53-9, pp. 3, 4; *see also* Doc. 49-15, ¶¶7–12.)

During the Term Limit, Yang agreed to furnish personnel and "materials, equipment, and property necessary to perform the work" identified in Part V of the Subcontract ("**Scope of Work**").[23] (*See* Subcontract, Part II, ¶1(a).) Generally, Yang's Scope of Work concerned "access control, training, logistic support, [and] IT help desk." (Doc. 51-3, p. 37.) Initially, the Scope of Work explicitly included: (a) operation of the Air Force Records Center, the "Spaceport Information System Help Desk," and the "IT Help Desk" (*id*. Part V, ¶¶1.0, 3.1 3.5.1); (b) access and "visitor control and operations training" for several 45 SW facilities—including two payload processing facilities ("**PPFs**") and the Spacecraft Processing Integration Facility ("**SPIF**") (*id*. ¶¶1.0, 3.2, 3.6.1); and (c) logistics (*id*. ¶¶1.0, 3.1). (*See* Doc. 59, ¶¶30–33; *see also* Doc. 51-1, pp. 40–43.)

As the prime contractor, SCLS worked with 45 SW to "develop a budget" for each FY (*see* Doc. 51-4, p. 21), and it could expand the Scope of Work to include additional services within Yang's capabilities (*see* Doc. 51-3, p. 41).[24] SCLS also could "direct" Yang to purchase "materials" under the Prime Contract. (*See* Subcontract, Part V, ¶3.1.3; *see also*

---

[23] More particularly, Part V of the Subcontract referenced the Prime PWS, §§ 2.9 ("Property Management"), 4.8 ("Access Control Monitoring"), 4.9 ("Service System Parts and Supply Inventory"), 6.1 ("Air Force Visitor Records Center"), and 6.4.2 ("Spaceport Information Systems (Help Desk/Database Administration)"). (*See id*. ¶2.0; *supra* n.8.)

[24] The President of SCLS testified that he could "mandate" that Yang be given additional opportunities, but doing so could "potentially" be "detrimental to the overall performance of the contract." (*See* Doc. 51-2, pp. 68–69; *see also id*. at 32 (noting that SCLS could "assign work to the subcontractors" or "retain work and self-perform" under the Prime Contract); Doc. 51-3, pp. 33–35 (testifying that when funding changed, SCLS was responsible for spreading losses in accordance with the priorities set forth in an Integrated Master Program Plan ("**IMPP**")); Doc. 51-5, p. 37 (testifying that SCLS could "shift" work in order to comply with the Subcontracting Plan).)

-14-

Doc. 59, ¶¶34, 35.) Based on properly submitted vouchers and invoices,[25] SCLS agreed to pay Yang for requested services and materials provided under the Subcontract.[26] (*See id.* Part II, ¶¶4(a), 15(f); *see also* Doc. 51-1, pp. 58–59; Doc. 51-4, pp. 16–17.) Under Term 1(d), SCLS also agreed that:

> *During the life of the [Prime] Contract, SCLS will provide [Yang] with subcontract opportunities (CFM purchases) sufficient to maintain an overall subcontract value equal to 12% of the total estimated cost of the projected contract funded value identified at award.* This value may be increased as additional funding for projects is provided. However, [Yang] recognizes that SCLS must meet the stated goals in the [Subcontracting Plan]. Therefore, [Yang's] overall progress toward meeting its share is subject to semi-annual adjustments of the CFM portion, in order to meet stated [Yang] goals. [Yang] understands that the amounts set forth in Attachment 1 for CFM include G&A. In addition, [Yang] agrees to apply no indirect costs other than 2.0% general and administrative ("**G&A**") expenses to CFM. [Yang] shall recoup full G&A on a maximum of 75% of the total estimated subcontract value. The remaining share shall be receive [sic] no more than 2% G&A.[27]

(Prime Contract, Part I, Term 1(d) (emphasis added).) "The total amounts estimated on the Signature Page and Attachment I" of the Subcontract—**$35,721,986** ("**Estimated Subcontract Value**")—equaled "12% of the total estimated cost of the Prime Contract at

---

[25] An invoice is "a contractor's bill or written request for payment under the contract for supplies delivered or services performed," and a "[p]roper invoice" is "an invoice that meets the minimum standards specified in [FAR §] 32.905(b)." FAR § 2.101.

[26] Yang was required to submit "vouchers" for payment of Award Fees. (*See* Subcontract, Part II, ¶7(c); *see also* Doc. 49-15, ¶13.)

[27] "G&A" is defined as "any management, financial, and other expense which is incurred by or allocated to a business unit and which is for the general management and administration of the business unit as a whole. G&A expense does not include those management expenses whose beneficial or causal relationship to cost objectives can be more directly measured by a base other than a cost input base representing the total activity of a business unit during a cost accounting period." FAR § 2.101.

the time of award."[28] (Doc. 59, ¶¶38, 59; *see also* Doc. 57, p. 4; *supra* Part III.C.I (discussing provisions of the Prime Contract related to its "Total Funded Contract Value").)

### E.    The NRO Agreements

"On or about March 21, 2006, Yang and SCLS entered into Subcontract Number 05-C-008-02A" ("**NRO Subcontract**"). (Doc. 59, ¶¶40, 41.) "The NRO Subcontract was issued under Prime Contract Number NRO000-06-C-0220" ("**NRO Prime Contract**"). (Doc. 59, ¶42.) "The parties to the NRO Prime Contract were SCSL (as the prime contractor) and the United States National Reconnaissance Office" ("**NRO**"). (*Id*. ¶¶43, 44.) Both the NRO Prime Contract and the NRO Subcontract were Fixed Price Level of Effort Award Fee Contracts ("**FPFC**") and were funded by the NRO. (*Id*. ¶¶45, 46, 48.) The NRO Prime Contract imposed distinct subcontracting requirements on SCLS, and—in its efforts to comply with the Subcontracting Plan—SCLS did not count or report the NRO Subcontract. (*See* Docs. 72, 72-1.)

### F.    The Shortfall Dispute

From the inception of the Subcontract, Yang provided less than 12% of the CFM and services delivered to 45 SW under the Prime Contract, and Yang repeatedly complained to SCLS that it must provide Yang with additional work to make up the "shortfall" under Term 1(d) ("**Shortfall Dispute**"). (*See* Doc. 51-2, pp. 64, 65, 67–68; Doc. 51-3, pp. 4–5; Doc. 51-5, pp. 50–51; *see also* Doc. 59, ¶¶55, 56.) SCLS understood

---

[28] The Estimated Subcontract Value included estimated Costs of **$33,075,913**, Base Fees of **$992,277**, and MAFs of **$1,653,796**. (*See* Subcontract, Part VI, Attachment I; Doc. 59, ¶37; *see also* Doc. 51-2, p. 51.)

Yang's position in the Shortfall Dispute to be that Term 1(d) unconditionally obligated SCLS to provide Yang with sufficient work under the Prime Contract to guarantee it payments equaling the Estimated Subcontract Value (*see* Doc. 59, ¶¶55, 56).

SCLS discussed the Shortfall Dispute internally and during meetings with Yang (*see* Doc. 51-2, pp. 21–22, 38–39, 46, 48–49, 51–55; Doc. 51-5, pp. 48–49, 54; Doc. 51-6, pp. 17–18), but the matter was never resolved to either party's satisfaction.[29] Ultimately, after paying every invoice and voucher submitted by Yang for all the work that Yang performed under the Term Limit of the Subcontract, the total amount of such payments was only **$26,356,840** ("**Actual Subcontract Value**").[30] (*See* Doc. 59, ¶¶39, 57–62.) In this action, Yang has contended that SCLS owes Yang the difference between the Estimated Subcontract Value and the Actual Subcontract Value—approximately **$9,365,145.00**. (*See* Doc. 49-6.) Of this amount, Plaintiff attributed **$8,349,132.00** to "lost revenue" ("**Unearned Costs**"), **$612,353.00** "for Fee" ("**Unearned Fees**"), and **$403,660.00** for G&A.[31] (*See id.*; *see also* Doc. 51, pp. 16–21 n.5; Doc. 59, ¶¶ 55–57.)

---

[29] During 2008, 2011 and 2012, SCLS unsuccessfully sought to modify, and "clarify" Term 1(d) or to delete Term 1(d) and the ECF and AF Summaries. (*See* Doc. 51-2, pp. 46, 48–49, 51–55; Doc. 51-3, pp. 4–5; Doc. 51-5, pp. 57–58, 62, 65–66, 68, 70–71); Doc. 51-6, pp. 2–6.) Subsequently, SCLS attributed the purported Shortfall to Yang's accounting decisions. (Doc. 51-6, p. 13 (attributing the "discrepancy" to Yang's "decision not to include in your accounting the full extent of work subcontracted by SCLS to [Yang] since the start" of the Subcontract).)

[30] The Actual Subcontract Value consisted of **$24,323,120** in Costs, **$787,167** in Base Fees, and **$1,251,553** in Award Fees. (*See id.* ¶57.)

[31] At the Pretrial Conference on November 16, 2017, the parties advised that these figures—particularly the G&A figure—are currently uncertain. Such uncertainty is not material to the Court's analysis of the discrete issues addressed in this summary judgment Order.

## IV.    DISCUSSION

### A.    The Cross Motions for Summary Judgment

SCLS requests that the Court enter summary judgment in its favor on both of Yang's claims. (Doc. 49 ("**SCLS Motion**").) To that end, it argues: (1) because the Subcontract was a CPAF agreement, Term 1(d) can only be viewed as an aspirational provision ("**Aspirational Construction Argument**"); (2) any recovery of "Costs" under the Subcontract would be an impermissible "windfall" under the law ("**Damages Argument**"); and (3) under the Prime Contract under Term 16(c), Yang disclaimed entitlement to the only damages that might be recoverable here ("**Disclaimer Argument**"). (*See id.; see also* Doc. 70, pp. 25–35; Doc. 71.)

Yang requests that the Court enter partial summary judgment in its favor on two issues: (1) "that the Subcontract obligated SCLS to provide it with sufficient work opportunities to realize" certain "agreed upon revenue" ("**Minimum Revenue Argument**");[32] and (2) "that performance of the NRO Subcontract in no way satisfied SCLS's obligations to [Yang] under the Subcontract" ("**NRO Argument**"). (*See* Doc. 51 ("**Yang Motion**").) The parties' respective arguments turn on very different interpretations of Subcontract Terms 1(d) and 16(c). To resolve these disputes, the Court must apply federal contract law to the extent that it exists. (*See supra* Part II.B.)

---

[32] Yang does not seek "a determination of the amount of the . . . revenue shortfall" at the summary judgment stage. (*See* Doc. 51, p. 2 n.1.)

### B.    Federal Contract Law

Under federal contract law, the courts—not juries—are taxed with contract interpretation, including identifying and resolving ambiguous provisions.[33] *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996); *Lanclos v. United States*, 133 Fed. Cl. 113, 115 (Ct. Cl. 2017) (noting that contract interpretation is an "issue properly resolved as a matter of law"). Generally, courts endeavor to give contractual language the "meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *See TEG-Paradigm Envt'l, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006).

"[W]ell-settled principles of contract interpretation" require that courts "begin with the plain language of the contract." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006). Courts must read such language "as a whole and 'in a manner which gives reasonable meaning'" to all parts of a contract "'and avoids conflict or surplusage of its provisions.'"[34] *See United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997); *Burnside-Ott Aviation Training Ctr. v. Dalton*,

---

[33] In contrast, under Virginia law, when an ambiguity is present in a contract, a question of fact for the jury is raised as to the "intention of the parties." *See Cascades N. Venture Ltd. P'ship v. PRC Inc.*, 457 S.E.2d 370, 375 (Va. 1995) (reversing summary judgment order and remanding for trial on ambiguity issue).

[34] Generally: (i) "'an interpretation which gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it inoperative or superfluous; and'" and (ii) "'contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible.'" *See Dewakuku v. Martinez*, 271 F.3d 1031, 1042 (Fed. Cir. 2001) (quoting *Morrison–Knudsen Co. v. United States*, 397 F.2d 826, 842 (Ct. Cl. 1968)).

107 F.3d 854, 860 (Fed. Cir. 1997). Courts also must give clear and unambiguous contract provisions "their plain and ordinary meaning." *See United Int'l*, 109 F.3d at 737; *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993).

To proffer a contract interpretation that is so "patently ambiguous" or "glaring as to raise a duty to inquire" into its meaning the party must establish that it confirmed the applicability of such interpretation before bidding. *See T. Brown Constructors, Inv. v. Pena*, 132 F.3d 724, 731, 735 (Fed. Cir. 1997); *Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993). Absent such confirmation, courts must reject patently ambiguous interpretations. *See Triax Pac. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997). In contrast, if proffered interpretations reflect a latent ambiguity, then federal law generally requires that ambiguities "be resolved against the drafter" when "the intention of the parties does not otherwise appear" and the non-drafting party "actually and reasonably relied" on its interpretation. *See HPI/G SA, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004); *see also Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997); *Kelso*, 987 F.2d at 1579.

Generally, courts will not find that a contract is ambiguous unless it is "susceptible to more than one *reasonable* interpretation." *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (emphasis added). To detect an ambiguity, courts should "consider the context in which the parties exchanged promises." *See id.* at 752 (rejecting argument that ambiguity should be determined solely from "the face" of a contract). Likewise, in resolving an ambiguity, courts may consider extrinsic evidence. *See Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (noting that

courts should consider extrinsic evidence to aid in their interpretation of an ambiguous contract).

## C.    Term 1(d)

First, the Court rejects the most extreme interpretations of Term 1(d) proffered by the parties. As stated during the Hearing, the Court rejects any contention that the Subcontract unconditionally entitled Yang to $35 million upon execution of the Subcontract. (*See* Doc. 70, p. 27; Doc. 49, pp. 1–2 (characterizing Yang's interpretation of Term 1(d) as "a check for $35,721,986 when [the Subcontract] was signed in 2005").) Given the obvious contingencies known to the parties that were apparent on the face of the Subcontract in May 2005, the Court cannot find that the Subcontract unambiguously imposed an unconditional duty on SCLS to pay Yang $35 million.

The Court is similarly unpersuaded by SCLS's contention that Term 1(d) unambiguously established only an "aspirational goal." (*See* Doc. 70, pp. 24, 26–28, 42; *see also* Doc. 51-2, pp. 23, 25 (characterizing Term 1(d) as a mere aspiration).) According to SCLS, this interpretation follows from "the very nature" of CPAFs, which contemplate "[f]actors beyond the parties' control," and from certain FARs that are incorporated by reference in the Subcontract. (Doc. 49, pp. 2–3, 17–27.)

On careful review, SCLS's arguments concerning the FARs are wholly unpersuasive,[35] and FARs are entitled to less weight than Term 1(d) in any event. (*See*

---

[35] In its arguments concerning the FARs, SCLS substitutes itself for "Government" in various places. SCLS justifies doing so based on Part I, Section 10 of the Subcontract ("**General Redefinition Provision**") which provides:

Subcontract, Part I, ¶ 28); *see also Abraham*, 326 F.3d at 1253 (noting that standardized terms are given less weight than terms that are separately negotiated). SCLS's arguments concerning the nature of CPAFs are similarly unpersuasive as they would leave parties to such agreements with no recourse when they are deprived of an anticipated contractual benefit that turned on necessarily uncertain events. Federal contract law does not mandate such a result. Rather, it allows contracting parties to create enforceable duties and allocate risk in the face of various contingencies — including uncertain funding. *See Medart, Inv. v. Austin*, 967 F.2d 579, 582 (Fed. Cir. 1992); *Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 329 (Fed. Cl. 1993); *Paul Morrell, Inc. v. Kellogg Brown & Root, Inc.*, 682 F. Supp. 2d 606, 611, 618, 626–27 (E.D. Va. 2010). Finally, the Court will not treat

Wherever necessary to make the context of clauses and terms and conditions set forth herein and applicable to this subcontract, the terms "Government," "Contracting Officer," and equivalent phrases shall mean Space Coast Launch Services ("SCLS") except the terms "Government" and "Contracting Officer" do not change: (1) in the phrases "Government Property," and "Government-Owned Equipment;" (2) when a right, act, authorization, or obligation can be granted or performed only by the Government or the Prime Contract Contracting Officer or her/his duly authorized representative; (3) when access to proprietary financial information of other proprietary data is required; (4) when title to property is to be transferred directly to the Government; or (5) where specifically modified as noted elsewhere in this Subcontract.

(*See* Doc. 49, p. 18 n.14.) Notably, another redefinition provision is set forth in Part III of the Subcontract, where the FARs are "incorporated" by reference: "Except as may be expressly otherwise provided below in each of such clauses, "Contractor" shall mean Yang, "Subcontractor" shall mean Yang's subcontractor, and "Contract" shall mean the Subcontract" ("**FAR Redefinition Provision**"). The FAR Redefinition Provision further provides that "'Contracting Officer' shall mean the Contracting Officer of the [Prime Contract] unless otherwise specified" ("**Contracting Officer Exception**"). In making substitutions in support of its FAR arguments, SCLS simply ignores the FAR Redefinition Provision, the Contracting Officer Exception, and the requirement of the General Redefinition Provision that substitutions must be "necessary." For instance, despite the Contracting Officer Exception, SCLS twice substitutes itself for "Contracting Officer" in the third sentence of FAR 52.232.18 — after already substituting itself for Government" in the second sentence. Similarly, SCLS consistently substitutes itself for "Government" and "Contracting Officer" in FAR § 52.232-22, even where doing so makes no sense.

Term 1(d) as aspirational given the "general rule of contract interpretation that terms of a contract should not be interpreted so as to render them ineffective or superfluous." *See Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242, 1253–54 (Fed. Cir. 2003); *see also Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12–13 (D.D.C. 2009) (rejecting argument that an agreement "to assist" another constituted a "mere statement of intention").

Setting aside the parties' unreasonable interpretations of Term 1(d), and reading the Subcontract as a whole and in relation to the Prime Contract, the Court finds that Term 1(d) unambiguously imposed a contractual obligation on SCLS to direct or request that Yang provide enough supplies or services required for performance of the Prime Contract so that, over the Term Limit, Yang could receive the Minimum Value in payments. Viewed in context, this interpretation follows from the plain and ordinary meaning of these words:

> During the life of the [Prime] Contract,
>
> SCLS will provide [Yang] with
>
> subcontract opportunities (CFM purchases)
>
> sufficient to maintain
>
> an overall subcontract value equal to 12% of
>
> the total estimated cost of the projected contract funded value identified at award.

(Subcontract, Part I, ¶1(d).)

The meaning of "life of the Prime Contract" is discerned from looking to the Prime Contract itself. Although the Prime Contract makes no reference to its "life," it explains that: (1) its term would consist of specified Contract Periods as exercised under the Option Clause (*see supra*, Part III.C.1; *see also* Prime Contract, §§ B & I); but (2) its "total duration . . . including the exercise of any options . . . *shall not* exceed 10 years 5 months." (*See* Prime Contract, § I (emphasis added).) Given that "**[s]hall** denotes the imperative" under FAR § 2.101, the "life" of the Prime Contract was a variable term that could be no more than 10 years and 5 months. *See supra* Part III.C.1 (discussing the Term Limit and Option Clause). Here, 45 SW exercised every option; thus, SCLS's duties under Term 1(d) must be measured against the full Term Limit.

"[T]he total estimated cost of the projected contract funded value identified at award" is similarly unambiguous when viewed in the context of the referenced Prime Contract. As explained in Part III.C.1, *supra*, the Prime Contract uses the phrase "Total Funded Contract Value" to refer to the "the estimated cost, base fee and [MAF] pool of the total funded contract value" for each of the Contract Periods in the Term Limit. (*See* Prime Contract, § B.) Given the plain meaning of the similar phrasing in the two agreements, the Court finds that "the total estimated cost of the projected contract funded value identified at award" meant the numerical figure of **$297,683,218**.

Having determined that the life of the Prime Contract refers to a variable term that in fact covered the full Term Limit and the numerical figure for the "total estimated cost of the projected contract value identified at award" is **$297,683,218**, the meaning of "overall subcontract value equal to 12% of the total estimated cost of the projected

-24-

contract funded value identified at award" is determined by applying ordinary math:

$$.12 \times 297{,}683{,}218 = 35{,}721{,}986.16$$

Notably, the result of this equation nearly equates to the figure provided by the Subcontract as the "Total Estimated Cost and Fee" for all possible Subcontract Contract Periods—**$35,721,986**. (*See* Subcontract, Signature Page & Attachment 1.) Thus, the Court finds that "overall subcontract value equal to 12% of the total estimated cost of the projected contract funded value identified at award" means **$35,721,986**.

The meaning of the term "subcontract opportunities" is also informed by reference to the Prime Contract, where SCLS used it in the Subcontracting Plan. (*See supra* Part III.C.2 (discussing the Minimum Subcontracting Requirement and the Subcontracting Plan).) In the Subcontracting Plan, which is directly referenced in Term 1(d)—where Yang recognizes that SCLS must meet the stated goals in the [Subcontracting Plan]—the term "subcontracting opportunities" contemplates an offer or direction to an SB from SCLS for the SB to provide "material and services" that are required under the Prime Contract.[36] (*See id.*; *see also* Prime Contract, Attachment 5, pp. 4, 5.) This use is consistent with FAR, which defines a "subcontract" as "*any agreement entered into* by a Federal Government prime Contractor . . . calling for supplies or services *required for performance of the contract.*"[37] FAR § 52.219-9 (emphasis added).

---

[36] The Court declines to rely on dictionary definitions provided by SCLS for the word "opportunity" because such definitions are divorced from the parties' own use of the phrase "subcontracting opportunities" and the context in which the Subcontract was entered.

[37] Further, a "contract" is defined as "a mutually binding legal relationship obligating the seller to furnish the supplies or services . . . and the buyer to pay for them."

Finally, the Court has given the remaining phrases employed in Term 1(d)—"will provide" and "sufficient to maintain" their plain and ordinary meaning. In doing so, the Court notes that "will" is compulsory, not discretionary. Further, "sufficient to maintain" denotes a contemporaneous obligation that further supports the finding that Term 1(d) did not unconditionally guarantee Yang's receipt of the Minimum Value. Rather, the Minimum Value was tied to the Prime Contract's variable term. *See Lanclos*, 133 Fed. Cl. at 118 (noting the importance of syntax and grammatical structure to contract interpretation). Here, the Prime Contract was fully funded during the maximum Term Limit; thus, SCLS had a legally enforceable obligation to provide Yang with subcontracting opportunities sufficient to maintain an overall Subcontract value of **$35,721,986**.

Because the meaning of Term 1(d) is plain, the Court need not consider extrinsic evidence. Nonetheless, the Teaming Agreement and a record maintained by SCLS titled "**Negotiation Memorandum**" are worth noting. *See TEG-Paradigm*, 465 F.3d at 1338 (noting that courts look to extrinsic evidence "to confirm that the parties intended for the term to have it plain and ordinary meaning"). The Negotiation Memorandum explicitly references Yang, the Subcontract, the Prime Contract, and it bears the signature of SCLS's signatory to the Subcontract—Kay S. Diekemper. (*See* Doc. 52-2, p. 49.) In a summary of "issues affecting negotiation," the Negotiation Memorandum states that:

---

FAR § 2.101. And contracting means "purchasing, renting, leasing, or otherwise obtaining supplies or services from nonfederal sources." *Id*.

> d. YEI was guaranteed 12% of the total estimated cost as a part of the teaming agreement. The resultant share based on staffing did not meet the intent of the TA. Therefore it was agreed that YEI would be provided subcontracting opportunities to increase their share. It was agreed however that no indirect expense other than G&A would be applied to CFM purchased by YEI. In addition, the overall share is based on the original projected contract funded value identified at award.

(*See id.* (referencing Yang as "YEI" and the Teaming Agreement as "TA").) These statements and Exhibit A to the Teaming Agreement are consistent with the Court's plain reading of Term 1(d), and they are the sort of extrinsic evidence—negotiating history and contemporaneous understandings—that federal courts have found to be "particularly probative of the meaning of a contract." *See Reliable Contracting Grp., LLC v. Dep't of Veterans Affairs*, 779 F.3d 1329, 1332 (Fed. Cir. 2015); *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1354 (Fed. Cir. 2006).

Although the Court has not adopted Yang's Minimum Revenue Argument, under the Court's plain reading of Term 1(d), Yang's Motion is due to be granted with respect to the first element of its claims.[38] *See Filak*, 594 S.E.2d at 619. Specifically, the Court finds as a matter of law that:

> From May 2, 2005 until September 30, 2015, SCLS had a "legally enforceable obligation" under the Subcontract to request or direct that Yang provide enough CFM or services required for performance of the Prime Contract to allow Yang to earn **$35,721,986.**

Finally, because "subcontracting opportunities" were limited under the Subcontract to

---

[38] At the Hearing, SCLS conceded that it had to give Yang "opportunities" under the Subcontract, and whether it did so "would likely be a fact question." (*See* Doc. 70, pp. 28–29.) The Court agrees.

the provision of CFM or services "required for performance" of the Prime Contract, the Yang Motion also is due to be granted with respect to the NRO Argument. (*See supra* Part III.E (summarizing some of the undisputed distinctions between the Prime Contract and Subcontract and the NRO Prime Contract and NRO Subcontract).)

### D.     Damages

As stated during the Hearing, SCLS's Damages Argument is well-founded. (*See* Doc. 70, pp. 32–33 (agreeing that Yang cannot recover funds that they would have expended in performing its obligations under the Subcontract); *see also* Doc. 49, pp. 34–36 (noting that Yang could not have received any benefit from the estimated $33,075,913 of estimated Costs under the Subcontract).) The Court now explicitly finds that the SCLS Motion is due to be granted with respect to the Damages Argument because Yang cannot recover its Unearned Costs as a matter of Virginia law. (*Supra* Part II.C. (discussing the proper measure of unliquidated damages for breach of contract).)

### E.     Term 16(c)

SCLS's Disclaimer Argument turns on the meaning of Term 16(c), which provides that SCLS and Yang "shall" not "be liable for lost profits, loss of use, or interruption of business, nor for consequential, indirect, special, punitive, or incidental damages incurred by the other part as a result of this agreement." (*See* Doc. 49; Doc. 70, pp. 25–35; Doc. 71.) SCLS contends that this language constitutes a "clear and unambiguous waiver of liability provision that absolves either party from any liability for the very damages Yang seeks"—that is the Unearned Fees. (Doc. 49, pp. 33–37.) Specifically, SCLS contends that the Unearned Fees constitute "lost profits". (*See* Doc. 72, p. 2 n.4 (noting that Yang

referred to the Unearned Fees as "lost profits" in its discovery responses).)

Yang counters that the Court should reject the Disclaimer Argument because, properly construed, Term 16(c) only waives entitlement to damages in the context of indemnity actions. (*See* Docs. 56, 73.) In this regard, Yang notes that Term 16(c) appears in a section of the Subcontract that is plainly titled "**INDEMNITY**."[39] Alternatively, Yang contends that the Court must narrowly construe Term 16(c) to cover only *indirect* lost profit damages—not sums like the Unearned Fees are a direct consequence of a breach.[40] (*See* Docs. 56, 73.)

Unlike Term 1(d), the meaning of Term 16(c) cannot be discerned from reading the Subcontract in accord with existing federal contract law. To the contrary, both parties have proffered reasonable conflicting interpretations of Term 16(c), which the Court declines to resolve without additional extrinsic evidence from which the Court can determine—among other things—which one of them "drafted" the Subcontract. (*See supra* Part IV.B (explaining that federal courts apply *contra proferenem* when "the intention

---

[39] Absent a contractual provision to the contrary, labels are generally viewed as "helpful in determining contractual intent," but they are not "controlling." *See Donnelly v. Donatelli & Klein, Inc.*, 519 S.E.2d 133, 138 (Va. 1999); *see also Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*, No. 3:11cv630, 2012 WL 2005110, at *6 (E.D. Va. Jul. 16, 2012); *Portsmouth Redevel. & Hous. Auth. v. Ison*, 66 Va. Cir. 336, 337 (Va. Cir. Ct. 2005). This treatment of labels is consistent with federal contract law that disfavors the disregard of any contractual terms. *See Burnside-Ott*, 107 F.3d at 860.

[40] The term "lost profits" does not appear to have an established meaning under Virginia or federal contract law. *See In re Buffalo Coal Co.*, 424 B.R. 738, 743–46 (Bankr. N.D. W. Va. 2010) (noting that "lost profits" can refer to different measures of damages and finding that parties did not intend to disclaim entitlement to lost profits "as an element of a party's direct actual damage"); *see also SOLIDFX, LLC v. Jeppesen Sanderon, Inc.*, 841 F.3d 827, 834–35 (10th Cir. 2016) (contrasting the broad term "loss of profits" with the more limited phrase "lost profits").

of the parties does not otherwise appear" and the non-drafting party "actually and reasonably relied" on its interpretation). Accordingly, the Court rejects the Disclaimer Argument and finds that the SCLS Motion is due to be denied without prejudice.[41]

## V.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.     Plaintiff, Yang Enterprises, Inc.'s Motion for Summary Judgment on Interpretation of Contract(s) and Incorporated Memorandum of Law (Doc. 51) is **GRANTED** as set forth in this Order.

2.     Defendant Space Coast Launch Services, LLC's Motion for Summary Judgment (Doc. 49) is **GRANTED** to the extent that partial judgment is sought against Yang Enterprises, Inc.'s on its claim for damages based on Unearned Costs. The Motion is **DENIED** in all other respects.

**DONE AND ORDERED** in Orlando, Florida, this 17th day of November, 2017.



ROY B. DALTON JR.
United States District Judge

Copies to:

---

[41] To the extent it is based on the Aspirational Construction Argument, the SCLS Motion is due to be denied with prejudice.

Counsel of Record